**MEDINOL LTD., Plaintiff and Counter–Defendant,**

v.

**GUIDANT CORP. and Advanced Cardiovascular Systems, Inc., Defendants and Counter–Plaintiffs.**

**No. 03 Civ. 2604(SAS).**

United States District Court,
S.D. New York.

Dec. 27, 2005.

---

Keith R. Hummel, Rory O. Millson, Fabian D. Gonell, Cravath, Swaine & Moore LLP, New York, NY, Christopher A. Hughes, Richard C. Komson, Dorothy R. Auth, Morgan & Finnegan, LLP, New York, NY, for Plaintiff.

J. Michael Jakes, Christine E. Lehman, Robert F. Shaffer, Finnegan, Henderson, Farabow, Garrett & Dunner LLP, Washington, DC, R. Scott Garley, Oren Warshavsky, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., New York, NY, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Medinol Ltd. ("Medinol") brings this action for damages and declaratory and permanent injunctive relief relating to the alleged infringement by Guidant Corp. and its subsidiary Advanced Cardiovascular Systems, Inc. ("ACS") (collectively "Guidant") of certain of Medinol's patents.[1] This Opinion resolves Guidant's motion for summary judgment on the issue of invalidity, which asserts that all claims of the patents-in-suit are obvious as a matter of law.[2] For the following reasons, Guidant's motion for summary judgment on invalidity is denied.

## II. BACKGROUND

Two previous Opinions have been issued in this case. One granted in part and denied in part Guidant's motion for summary judgment based on collateral estoppel.[3] The other construed several terms necessary to evaluate the claims in this case.[4] Familiarity with both Opinions is assumed.

### A. The Parties

Medinol, which has its principal place of business in Tel Aviv, Israel, designs and manufactures coronary stents.[5] The company was founded by, among others, Dr. Jacob ("Kobi") Richter, who currently serves as Medinol's Chairman of the Board and Chief Technical Officer.[6] Guidant develops, markets, and sells cardiovascular medical products and has its principal place of business in Indiana. ACS has its principal place of business in California.[7]

### B. The Technology

The devices at issue in this litigation are directed toward opening diseased coronary arteries[8] and maintaining blood flow to and

---

1. At issue are U.S. Patent Nos.: (1) 5,843,120 ("'120 Patent"); (2) 6,443,982 ("'982 Patent"); and (3) 6,461,381 ("'381 Patent") (collectively "patents-in-suit"). Specifically, Medinol alleges that Guidant has willfully infringed Medinol's patents through the alleged manufacture, use, offer for sale, sale, and/or importation of MULTI LINK PENTA® and MULTI LINK ZETA0 systems, which contain stents for implantation in human vessels.

2. The parties have also filed cross-motions for summary judgment on the issue of infringement, not addressed by this Opinion.

3. *See generally Medinol v. Guidant*, 341 F.Supp.2d 301 (S.D.N.Y.2004) (*"Medinol I"*). On that motion, Guidant asserted that many of the claims asserted by Medinol in this litigation were barred by collateral estoppel due to the jury verdict in *Scimed Life Sys.,*

*Inc. v. Johnson & Johnson*, 225 F.Supp.2d 422 (D.Del.2002) (the *"Cordis"* litigation).

4. *See generally Medinol v. Guidant*, No. 03 Civ. 2604, 2004 WL 2210290 (S.D.N.Y. Sept. 30, 2004) (*"Medinol II"*).

5. *See* Complaint ¶ 5.

6. *See* Rule 56.1 Statement of Undisputed Facts in Support of Guidant's Motion for Summary Judgment of Invalidity ¶ 4 ("Def. 56.1").

7. *See* Complaint ¶¶ 6–7.

8. A coronary artery is a blood vessel in the heart. *See Scimed Life Sys., Inc. v. Johnson & Johnson*, 225 F.Supp.2d 422, 425 (D.Del. 2002) (*"Cordis I"*).

from the heart.[9] In the 1970's, the preferred treatment for coronary artery disease was "balloon angioplasty," also known as "percutaneous transluminal coronary angioplasty", or PTCA.[10] This procedure involves first inserting a balloon into the diseased artery via a catheter, then inflating the balloon to push open the artery.[11] The goal is for the artery to stay open once the balloon is removed. However, in about thirty-five percent of such procedures, the effects were temporary and the artery eventually re-closed, or "recoiled."[12]

Stents provide a more permanent solution. A stent is a "medical device much like [ ] miniature scaffolding that physically holds open a diseased artery into which [it is] inserted."[13] Stents are used to treat diseased arteries in the heart (i.e. coronary arteries), as well as "peripheral arteries" located in other areas of the body.[14] Stents are introduced into the blood vessel on a balloon catheter, in a procedure during which the catheter is maneuvered into the blocked artery, where the balloon is inflated, causing the stent to expand against the vessel wall. Once the balloon has been deflated and removed, the stent remains in place indefinitely, holding the blood vessel open and thereby improving blood flow.[15]

The modern stent originated in the 1980s. In April 1988, a patent was issued to Julio Palmaz (Palmaz '762 Patent) for an "expandable intraluminal graft, and method and apparatus for implanting an expandable intraluminal graft," i.e., a "stent," which Johnson & Johnson commercialized in 1991. The Palmaz '762 Patent described the first stent to "include a plurality of closed cells" that, upon expansion, "transformed [from slot-shaped cells] into diamond-shaped cells, resulting in an expanded stent with a honeycomb appearance."[16]

At approximately the same time, Palmaz patented another stent (Palmaz '417 Patent) "combining slot-shaped cells with flexible connectors to increase longitudinal flexibility."[17] Other designs used "coil connectors" to impart great flexibility, but at the expense of radial strength once the stent is expanded or deployed.[18] In 1995, Richard Schatz developed a new variation

9. See 9/2/04 Markman Hearing Transcript ("Markman Tr."), at 5–6 (testimony of Jacob Richter).

10. See Medinol II, 2004 WL 2210290, at *1.

11. See Markman Tr. at 6 (Richter).

12. See id. at 6–7 (Richter). Additionally, as I have already noted:

> The major complications associated with balloon angioplasty are: (1) dissection, where the plaque "cracks" during the procedure, resulting in a flap that falls into the lumen creating a complete occlusion of the artery; (2) recoil of the vessel wall; and (3) restenosis, or renarrowing of the involved arteries, caused by a buildup of scar tissue created by the procedure. However, PTCA is generally less traumatic and expensive than the alternative—coronary artery bypass surgery.

Medinol II, 2004 WL 2210290, at *1 n. 8 (internal citations omitted).

13. Scimed Life Sys., Inc. v. Johnson & Johnson, 87 Fed.Appx. 729, 730 (Fed.Cir.2004) (unpublished decision) ("Cordis II").

14. See Cordis I, 225 F.Supp.2d at 425.

15. See Medinol I, 341 F.Supp.2d at 304 (quotation and citation omitted).

16. Id. at 305 (citation omitted).

17. Id. (citation omitted).

18. See id. For example, Rodney Wolff designed a stent in 1992 (Wolff '404 Patent) for Medtronic, Inc. using coil connectors. Another coil connector design favoring flexibility over radial strength was the Gianturco–Roubin I (GR–I) stent. See Markman Tr. 11–12 (Richter) ("since there is no longitudinal connection at all [in a coil stent], the rings are very free to move relative to each other. This stent is very, very, flexible. But because the rings [of the stent] can easily be pushed away from each other ... [the stent] would allow tissue to protrude between the struts. There

of the Palmaz stent, involving "straight flexible connectors between tube sections" (Palmaz/Schatz '984 Patent).[19]

## C. Prior Stent Designs

Three prior stent designs are particularly important to resolution of this motion. *First*, in the early 1990s, Guidant developed a stent design based on connecting single serpentine rings with flexible straight connectors, for which it obtained the Lau '955 Patent.[20] *Second*, in 1994, a team of engineers filed, and then abandoned, a patent application for a "hybrid stent" that attempted to combine flexibility and radial strength ("the Burmeister Application").[21] *Third*, in 1999, the Fischell '370 Patent was issued, disclosing a stent using rings that become circular when fully expanded, connected with either straight or "undulating" (looped) longitudinals.[22]

### 1. Lau

The Lau '955 Patent asserts that "[w]hat has been needed and heretofore unavailable is a stent which has a high degree of flexibility so that it can be advanced through tortuous passageways and can be readily expanded and yet have the mechanical strength to hold open the body lumen into which it is expanded. The present invention satisfies this need."[23] Lau's invention was summarized as "an expandable stent which is relatively flexible along its longitudinal axis to facilitate delivery through tortuous body lumens, but which is stiff and stable enough radially in an expanded condition to maintain the patency of a body lumen such as an artery when implanted therein."[24]

The Lau '955 Patent discloses an invention comprising serpentine rings, connected with straight "connectors," or links between rings.[25] The rings may be connected in two ways: out-of-phase (connecting adjacent crowns of rings that face each other) and in-phase (crowns pointing in one direction).[26] The out-of-phase design, shown in Lau Figure 11, contains only a single connector between each pair of rings.[27]

is also no good rigidity because the ring[s are] not closed.").

19. *Medinol I*, 341 F.Supp.2d at 305 (citation omitted).

20. *See generally* U.S. Patent No. 5,421,955 to Lilip Lau (June 6, 1995) ("Lau '955 Patent"), Exhibit 1 to Declaration of Robert F. Shaffer, counsel for Guidant ("Shaffer Decl."). This patent is a continuation of a series of patent applications originally filed on October 28, 1991. *See id.* col. 1

21. *See generally* U.S. Patent Application "Improved Tissue Supporting Devices" to Paul Burmeister, Charles Euteneuer, Brian Brown and Paul Fordenbacher ("Burmeister Application"), Ex. 4 to Shaffer Decl.

22. *See generally* U.S. Patent No. 5,879,370 to Robert Fischell et. al. ("Fischell '370 Patent"), Ex. 2 to Shaffer Decl. This patent is a continuation of a patent application originally filed on February 25, 1994. *See id.* col. 1; *see also* U.S. Patent No. 5,643,312 to Fischell ("Fischell '312 Patent"), Exhibit 28 to Second Declaration of Fabian D. Gonell, counsel to Medinol ("Gonell Decl."). References merely to "Fischell" or the "Fischell Patent" refer to the '370 Patent.

23. Lau '955 Patent col. 1, ll. 45–50.

24. *Id.* col. 1, ll. 53–58.

25. *See id.* col. 2 ll. 26–29 ("[t]he presently preferred structure for the expandable cylindrical elements which form the stents of the present invention generally have a circumferential undulating pattern, e.g. serpentine.").

26. *See id.* Fig. 5 (in phase); Fig. 11 (out of phase). Guidant commercialized the "in-phase" design as the Multi–Link stent. *See Medinol I*, 340 F.Supp.2d at 305.

27. *See* Lau '955 Patent Fig. 11, described by the patent as "a plain view of a flattened section of a stent illustrating an alternate undulating pattern." *See id.* col. 4, ll 8–10; *see*

While the straight connectors are designed to be inflexible, serving to "provide increased stability and ... prevent warping of the stent upon expansion," the rings themselves permit flexibility.[28] Moreover, Lau teaches that "[t]he number and location of elements interconnecting adjacent cylindrical elements can be varied in order to develop the desired longitudinal flexibility in the stent structure both in the unexpanded as well as the expanded condition."[29]

### 2. Burmeister

Beginning in 1994, Scimed engineers, including Burmeister, Euteneuer and Brown, sought to develop a hybrid stent that would partially self-expand, and then fully expand with a balloon.[30] A patent application to this effect, including several drawings, was filed with the U.S. Patent and Trademark Office ("PTO") on May 19, 1994. The application asserts that:

> [t]he devices of this invention are generally cylindrical or tubular in overall shape and of such a configuration as to allow radial expansion for enlargement. Furthermore, the devices are comprised of at least one component which exhibits a resiliency or spring-like tendency to self-expand the device and at least one other component which is deformable so as to allow an external force, such as a balloon positioned within the body of the device, to further expand it to a final desired size.[31]

Most relevant to this motion are Figures 14a and 14b of the Burmeister Application, created by Euteneuer and Brown.[32] Figure 14a discloses the Burmeister design in its unexpanded state, while Figure 14b reflects the expanded, or deployed, state. The team of engineers who produced the Burmeister design experimented with several different designs.[33] The Burmeister design embodied in Figures 14a and 14b never entered the market; it was abandoned soon after the first stainless-steel prototypes were produced.[34]

### 3. Fischell

The Fischell Patent describes itself as "an expandable stent that can be used in an artery or any other vessel of the human body which, when expanded, forms a multiplicity of generally circular rings whose closed structure optimizes hoop strength so as to minimize elastic recoil of the vessel into which the stent is inserted."[35] "Although the optimum design for maximizing

---

*also id.* col. 5, ll. 63–64 (Fig. 11 is an "alternative stent structure").

**28.** *Id.* col. 1, ll. 65–68.

**29.** *Id.* col. 3, ll. 6–10.

**30.** *See Cordis II,* 87 Fed.Appx. at 735; *see also* 7/15/04 Deposition Transcript of Brian Brown ("Brown Dep. Tr.") at Ex. 9, Ex. 20 to Gonell Decl. (declaration of Brown from earlier litigation, stating that his team began work in early 1994 on a project called "dual expansion stents," involving a stent using self-expansion as well as balloon expansion).

**31.** Burmeister Application at B1020 ("Summary of the Invention").

**32.** *See* Brown Dep. Tr. at 15–16. As of July 1994, Euteneuer and Brown had never filed a single patent application directed to stent design that later issued as a U.S. Patent. *See*

*generally* Exhibit 20 to Shaffer Decl. (documents from PTO website, so indicating). However, in future years, both became prolific inventors in the field of interventional cardiology, *see* Brown Dep. Tr. at 146–47 (establishing that Euteneuer now holds over sixty U.S. patents and patent applications, and that Brown holds at least thirty), and held high-level research related positions. *See id.* at 5–6, 98–100.

**33.** *See id.* at 129 (Burmeister team created "about a dozen" different prototypes for a hybrid stent, involving "different geometries").

**34.** *See id.* at 115–16; *see also* Brown Dep. Ex. 9.

**35.** Fischell '370 Patent, col. 1, ll. 41–45; *see also id.* Figs. 1–4.

hoop strength is a closed circular structure, no prior art stent has been described which has a small diameter when percutaneously inserted into a vessel and which expands into the form of multiplicity of closed circular structures (i.e., rings) expanded outward against the vessel wall."[36]

Fischell recites four objects, only two of which are relevant to this motion. *First,* "an object of this invention is to provide a stent having a maximum hoop strength by the employment of closed, generally circular structures which are in fact rings."[37] *Second,* "[s]till another object of this invention is that the fully deployed rings are spaced apart by means of longitudinals which are either straight or undulating wires that are placed to be generally parallel to the longitudinal axis of the vessel into which the stent is deployed."[38] Notably, Dr. Timothy Fischell, an inventor of the '370 patent, has testified that one of his goals was "to make a stent that would be very flexible."[39]

### D. The Patents–in–Suit

According to Richter, prior art stents on the market in the last half of 1993 all possessed advantages and offsetting disadvantages, because they:

were of two extreme kinds ..., [o]ne was very flexible ... but because it was very flexible, also when it was extended it was not stable. The loops could be drawn away from each other, and it would not support very well the lesion, the narrowing in the vessel. So, it could go anywhere you want [within the body], but would not support. The other type had a rigid enough, stable enough structure such that when deployed, it would support pretty well, but it was very inflexible, rigid. So you could not push it through the curves of the arterial system to the position you are trying to treat. That was suboptimal.[40]

The leading strong but inflexible stents were the Palmaz and Palmaz–Schatz. On the other end of the spectrum, coiled wire stents were very flexible, but at the expense of radial strength once deployed.[41] Richter has stated that "the idea [that] brewed in my mind ... [was] that flexibility was needed when you are trying to track it through the curviness of the artery, [b]ut once you get it to the position you don't need [flexibility.]."[42]

On September 12, 1995, U.S. Patent No. 5,449,373 was issued to Gregory Pinchasik

**36.** *Id.* col. 1, ll. 30–36.

**37.** *Id.* col. 1, ll. 55–58.

**38.** *Id.* col. 1, ll. 63–67. The other two objects of the Fischell patent are: "that the rings are initially in the form of ovals that can be folded to fit onto a cylindrical structure at a distal portion of a stent delivery catheter"; and "that the predeployment stent structure is formed as a single piece out of a metal tube having a smaller inside diameter as compared to the outside diameter of an expandable balloon onto which the pre-deployment stent structure is mounted." *Id.* col. 1, ll. 59–62; col. 2 ll. 1–5.
Medinol asserts that Fischell's "longitudinals" must run the length of the stent, *see* Medinol's Counterstatement of Facts Pursuant to Local Rule 56.1 in Opposition to Guidant's Motion for Summary Judgment of In-

validity ("Pl. 56.1") ¶ 156 (citing Fischell '370 Patent col. 1, ll. 49–50 and Figs. 1–9).

**39.** *Cordis Corp. v. Medtronic AVE, Inc.,* 194 F.Supp.2d 323, 355 (D.Del.2002), *rev'd on other grounds,* 339 F.3d 1352 (Fed.Cir.2003) (*"Medtronic"*) (quoting Fischell's trial testimony).

**40.** Pl. 56.1 ¶ 6 (quoting Trial Testimony of Jacob Richter at 73–76, *Medinol Ltd. v. Boston Scientific Corp.,* 346 F.Supp.2d 575 (S.D.N.Y.2004) ("Richter BSC Trial Testimony")).

**41.** *See Medinol II,* 2004 WL 2210290, at *2 (citations omitted).

**42.** Richter BSC Trial Testimony 346 F.Supp.2d at ——, slip op. at 73.

et al. and assigned to Medinol. The application for this patent was filed on March 17, 1994.[43] A series of stents, described as continuations or continuations-in-part of this patent, were invented by Henry Israel and Gregory Pinchasik, and assigned to Medinol.[44] These patents—the '303, '018, '120, '381, and '982—describe a family of flexible, expandable stents.[45] Specifically, Medinol's patents:

> share the same drawings, and essentially the same specification, and are described as continuations of a series of applications beginning with Application Serial No. 282,181 ... filed on July 28, 1994, and continuations-in-part of Application Serial No. 213,272 ... which was filed on March 17, 1994, and issued as [the Pinchasik '373 Patent]. The Medinol patents generally describe and illustrate stent designs that achieve the objectives and flexibility during delivery, compensation for foreshortening, continuous uniform scaffolding, and resistance to radial deformation and collapse upon expansion.[46]

Although Medinol originally alleged infringement of all five patents, "it has since dropped any claims relating to the '303 and '018 patents."[47] The remaining claims[48] can be divided into roughly two groups: the "meander" claims and the "flexible cell" claims. The "meander" claims, comprised of the asserted claims of the '120 and '982 Patents, generally describe stent structures comprised of two types of meander patterns intertwined with one another. These patterns are referred to as "first meanders," which extend in a circumferential direction; and "second meanders," which extend in a longitudinal direction.[49] I have construed "first meander" to mean "a periodic sinusoidal pattern about a center line."[50] I construed a "second meander" to mean "periodic pattern[s] about a center line oriented in a direction different from the axis of the first meanders."[51]

---

**43.** *See* U.S. Patent No. 5,449,373, title page.

**44.** The parties agree that the patents-in-suit are entitled to a priority date sometime in 1994, but have not specified an exact date. *See* Pl. 56.1 ¶ 94 ("the Patents-in-Suit are entitled to a priority date no later than July 28, 1994"); *see also* Opening Memorandum in Support of Defendants' Motion for Summary Judgment of Invalidity ("Def. Mem.") at 2, 24 (assuming that 1994 is the operative year for invalidity purposes). The exact priority date of the patents-in-suit is not material for purposes of this motion.

**45.** In addition to the patents listed *supra* at note 1, these include U.S. Patent No. 5,733,303 to Israel (the '303 Patent) and U.S. Patent No. 5,972,018 to Israel (the '018 Patent). *See* Complaint ¶¶ 11, 15.

**46.** *Cordis I*, 225 F.Supp.2d at 425. "Foreshortening" refers to the tendency of a stent to contract longitudinally as it expands, while "uniform scaffolding" refers to a stent that after expansion is "very smooth ... continuously pushing the vessel, [and] not letting pieces of the vessel wall protrude between [ ] struts." *Markman* Tr. at 16–17 (Richter).

**47.** Def. 56.1 ¶ 2 (citing 12/21/04 Letter from Gonell to Guidant). *Accord* Pl. 56.1 ¶ 2. In addition, I granted in part Guidant's motion for summary judgment based on collateral estoppel, eliminating two claims of the '303 and '018 patents. *See Medinol I*, 341 F.Supp.2d at 327.

**48.** For the full text of Medinol's claims, *see Medinol I*, 341 F.Supp.2d at 307–08. The text of the claims will also be quoted as needed in this Opinion.

**49.** "Circumferential" in this context means the material comprising the rings of the stent; while "longitudinal" describes an element that runs for some distance along the length of the stent. However, meander patterns need not be orthogonal to one another. *See Medinol II*, 2004 WL 2210290, at *6.

**50.** *Id.*, 2004 WL 2210290, at *13.

**51.** *Id.*

A "flexible cell," as used in the claims of the '381 Patent, has been construed as "[a]n arrangement of structural elements that defines an enclosed space. The cells must be substantially flexible prior to expansion of the stent and substantially rigid after expansion of the stent."[52]

Medinol introduced the NIR stent in 1996, based on the teachings of at least some of the patents-in-suit, although the record is unclear on this point.[53] Between 1996 and 2000, Medinol sold over two million NIR stents.[54] The NIR stent garnered notice from the industry as well. For example, Johnson & Johnson attempted to acquire the rights to the NIR stent in 1995, offering Medinol up to $335 million for the rights.[55] The President of Johnson & Johnson asserted that the NIR stent "uniquely combines (1) flexibility (a serious disadvantage in the Palmaz/Palmaz–Schatz slotted tube design) and (2) radial strength (better than our current design)."[56]

### E. The *Cordis* Litigation

In December 1999, Medinol and its licensee, Scimed Life Systems, Inc. ("Scimed"), filed a patent infringement action in Delaware, alleging that Cordis Corp., Johnson & Johnson, and Johnson & Johnson Interventional Systems, Inc. had infringed certain claims of Medinol's '303, '120, and '018 patents.[57] After a two-week jury trial, the jury returned various verdicts of infringement, noninfringement and invalidity.[58] Of most relevance to the present motion is that the *Cordis* jury found that all of the asserted claims were invalid for obviousness and failure to comply with the written description requirement, *except* for claim 13 of the '120 Patent.[59] Claim 13 is the only remaining claim common to the *Cordis* litigation and this case.[60]

The district court denied in part and granted in part Medinol and Scimed's motion for judgment as a matter of law ("JMOL") and for a new trial under Rule 59(a). Specifically, the court denied plaintiffs' motion as to infringement, and also rejected plaintiffs' argument that the asserted claims of the '303 and '018 patents are not invalid for obviousness, finding that "defendants presented substantial evidence to support a reasonable jury's conclusion that claims 12, 35, 47 and 60 would have been obvious to one of ordinary skill in the art in July 1994, the time the inventions described in those claims were made."[61]

52. *Id.* at *9.

53. *See* Def. 56.1 ¶ 19 ("[t]he original NIR stent is the commercial embodiment of Medinol's patents."); *see Markman* Tr. at 15 (Richter) ("the other direction or solution was the NIR stent that was developed along the teaching of the Israel patent by Medinol"). *See also infra* Part IV.B.4.

54. *See* 5/20/04 Richter Deposition Transcript ("Richter Dep. Tr.") at Ex. 4, Ex. 18 to Gonell Decl.

55. *See* Pl. 56.1 ¶ 197 (citing Guidant's Post–Hearing Brief, *Guidant Corp. v. Cordis Corp.*, Before an Arbitration Panel Convened by the Center for Public Resources Institute for Dispute Resolution ("Arbitration Brief"), Ex. 23 to Gonell Decl. at GC154628).

56. *Id.* ¶ 198 (quoting Arbitration Brief at GC154628).

57. In *Cordis*, Medinol asserted claims 12 of the '303 Patent; 13 of the '120 Patent; and 35, 47, and 60 of the '018 Patent. *See Medinol II*, 2004 WL 2210290, at *3 n. 29.

58. *See Medinol I*, 341 F.Supp.2d at 310–11.

59. *See id.* at 311.

60. *See* Pl. 56.1 ¶ 33 (citing *Medinol I*, 341 F.Supp.2d at 304 n. 3).

61. *Cordis I*, 225 F.Supp.2d at 440. However, finding that defendants failed to present clear and convincing evidence such that a reasonable jury could conclude that the claims are invalid for failure to comply with the written description requirement, the court granted

In particular, the court rejected plaintiffs' argument that they were entitled to a new trial based on an inconsistent jury verdict on obviousness:

> Claim 13 of the '120 patent has an additional limitation, *i.e.*, that the stent must have "at least one of the loops of each of the first meanders disposed between each consecutive second meander to which the first meander is connected" over claim 60 of the '018 patent. This supports the jury's verdict that claim 13 is not invalid for obviousness whereas claim 60 is invalid.[62]

Medinol and Scimed then unsuccessfully appealed the denial of their post-trial motions to the Federal Circuit, which held that "there was substantial evidence in the record to support the conclusion that the asserted claims of the '303 and '018 patents were obvious over the prior art at the time they were filed with the PTO."[63]

In response to plaintiffs' argument that "even if each of the elements of the asserted claims was in the prior art, the record does not demonstrate that there was a motivation to combine" them, the Federal Circuit referred to the Burmeister Application as substantial evidence that "a person of ordinary skill in the art did, in fact, combine the elements of the stent design claimed by the '303 and '018 patents prior to July 28, 1994."[64]

The jury had before it expert testimony that a person of ordinary skill in the art, on July 28, 1994, would inspect the drawings of the Burmeister application and conclude it disclosed a stent design that combined the claimed elements of the balloon expandable stent design taught by the patents-in-suit. This was legally sufficient evidence from which the jury could have found a motivation to combine in the knowledge of one of ordinary skill in the art, a finding of fact we must presume the jury to have made given that it returned a verdict on the validity issue in favor of Cordis.[65]

## III. LEGAL STANDARD

### A. Governing Law/Standard for Summary Judgment

■ As a general principle, Federal Circuit precedent governs issues of patent law, while the law of the regional circuit applies to nonpatent issues.[66] Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[67] "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'"[68] A fact is material when "it 'might affect the outcome of the suit under the

---

plaintiffs' motion for JMOL as to the "invalidity of claims 12, 35, 47, and 60 [of the '303 and '018 patents] based on failure to comply with the written description requirement." *Id.* at 439.

**62.** *Id.* at 441 n. 5.

**63.** *Scimed Life Sys., Inc.*, 87 Fed.Appx. at 735. Specifically, the Federal Circuit cited the testimony of Cordis's trial expert, Dr. Nigel Buller, as evidence of the existence of compensation for foreshortening in the prior art. Buller testified that stents constructed from combinations of rings and flexible connectors, "as required by the asserted claims of the '303 and '018 patents, were in the prior art." *Id.* at 733.

**64.** *Id.* at 735–36. The parties agreed that July 28, 1994 was the operative date for purposes of invalidity because each of the *Cordis* patents-in-suit were filed as continuations of an earlier patent dated July 28, 1994. *Id.* at 730.

**65.** *Id.* at 736.

**66.** *See, e.g., Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed.Cir.2003).

**67.** Fed.R.Civ.P. 56(c).

**68.** *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir.2005) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

governing law.' "[69] The movant has the burden of demonstrating that no genuine issue of material fact exists.[70]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than show that there is a " 'metaphysical doubt as to the material facts,' "[71] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' "[72] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[73]

### B. Standard of Review

■ A patent enjoys a presumption of validity.[74] A party seeking to destroy this presumption must do so with clear and convincing evidence of invalidity.[75] Clear and convincing evidence exists when the movant "place[s] in the mind of the ultimate fact finder an abiding conviction that the truth of its factual contentions are 'highly probable.' "[76]

### C. Obviousness

■ As an initial matter, "[t]he grant of summary judgment of invalidity for obviousness must be done on a claim by claim basis."[77] A claimed invention is unpatentable if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."[78] The ultimate determination of obviousness is a legal conclusion based on the following underlying factual inquiries: (1) the scope and content of the prior art;

**69.** *Id.* (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

**70.** *See, e.g., Vermont Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

**71.** *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 75 (2d Cir.2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

**72.** *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001)). "In a patent case, as in any other, summary judgment may be granted when there are no disputed issues of material fact, or when the non-movant cannot prevail on the evidence submitted when viewed in a light most favorable to it." *Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1383 (Fed.Cir.2004) (internal citation omitted).

**73.** *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir.2004).

**74.** *See* 35 U.S.C. § 282. Section 282 also states that "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; [and] dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."

**75.** *See, e.g., Enzo Biochem, Inc. v. Gen–Probe, Inc.*, 424 F.3d 1276, 1281 (Fed.Cir.2005).

**76.** *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir.1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)).

**77.** *Knoll Pharm. Co.*, 367 F.3d at 1383.

**78.** 35 U.S.C. § 103; *see also Graham v. John Deere Co.*, 383 U.S. 1, 13, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Section 103(a) states in pertinent part:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

(2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of non-obviousness.[79] Additionally, "[a] showing of obviousness requires a motivation or suggestion to combine or modify prior art references, coupled with a reasonable expectation of success." [80]

### 1. Scope and Content of Prior Art

The scope of the prior art has been defined as that " 'reasonably pertinent to the particular problem with which the inventor was involved.' "[81] "To ascertain the scope of the prior art, a court examines the field of the inventor's endeavor, and the problem with which the inventor was involved, at the time the invention was made."[82] Content in this context includes material established by the novelty subsections of section 102 of Title 35, United States Code, including, inter alia: 1) printed publications or patents from anywhere in the world published or issued before the date of invention; 2) a United States patent application subse-

quently issued, and filed before the date of invention; and 3) another's invention that was made in this country and not abandoned, suppressed, or concealed before the invention date of the invention in question.[83]

### 2. Level of Ordinary Skill in the Art

"[A] person having ordinary skill in the art" for the purpose of section 103 refers to a hypothetical person reasonably skilled in the applicable art.[84] However, this hypothetical person is incapable of thinking outside of the conventional wisdom in the art, as it stood at the time of the claimed invention.[85]

"In determining [the level of ordinary skill in the art], the court may consider various factors including [the] type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field."[86] Every one of these factors need not be present in every case, and one or more factors may predominate.[87] The skill level to be con-

---

79. See *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684; see also *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1369 (Fed.Cir.2005) (same).

80. *Boehringer Ingelheim Vetmedica, Inc. v. Schering–Plough Corp.*, 320 F.3d 1339, 1354 (Fed.Cir.2003). "While absolute certainty is not necessary to establish a reasonable expectation of success, there can be little better evidence negating an expectation of success than actual reports of failure." *Id.* (internal quotation and citation omitted).

81. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 664 (Fed.Cir.2000) (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535 (Fed.Cir. 1983)). Prior art "encompasses not only the field of the inventor's endeavor but also any analogous arts." *In re GPAC Inc.*, 57 F.3d 1573, 1577–78 (Fed.Cir.1995).

82. *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed.Cir.

1998) (internal quotation and citation omitted).

83. *See* 35 U.S.C. § 102.

84. *See, e.g., In re GPAC Inc.*, 57 F.3d at 1579 (citation omitted).

85. *See, e.g., Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed.Cir.1995); *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985) ("A person of ordinary skill in the art is . . . not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which.").

86. *Ruiz,* 234 F.3d at 666–67 (quotation and citation omitted).

87. *See id.* at 667 (citation omitted).

sidered is the level at the time the invention was made.[88]

### 3. Differences Between Claimed Invention and Prior Art

When assessing differences between the prior art and the claimed invention, section 103 requires consideration of the invention as a whole.[89] After all, inventions are often merely new combinations of existing principles or features.[90] Absent the "as a whole" requirement:

> [a]n obviousness assessment might successfully break an invention into its component parts, then find a prior art reference corresponding to each component. This line of reasoning would import hindsight into the obviousness determination by using the invention as a roadmap to find its prior art components. This improper method would discount the value of combining various existing

features or principles in a new way to achieve a new result—often the essence of invention.[91]

Accordingly, when obviousness is based on the teachings of multiple prior art references, the party claiming invalidity must establish a "motivation to combine" the references.[92] This means that there was some "suggestion, teaching, or motivation" that would have led a person of ordinary skill in the art to combine the relevant prior art teachings in the manner claimed.[93] That party must also show that such a combination would have had a reasonable chance of success.[94]

Accordingly, "[w]hen determining the patentability of a claimed invention which combines two known elements, 'the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.' "[95]

---

88. *See Mitsubishi Elec. Corp. v. Ampex Corp.*, 190 F.3d 1300, 1309 (Fed.Cir.1999).

89. *See Princeton Biochem., Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (Fed.Cir. 2005).

90. *See id.* (citing *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 698 (Fed.Cir. 1983) (noting that "virtually all [inventions] are combinations of old elements")).

91. *Princeton Biochem., Inc.*, 411 F.3d at 1337. *Accord Ruiz*, 357 F.3d at 1275.

92. There is some inconsistency in the caselaw regarding the relation of "motivation to combine" to the *Graham* analysis. For example, some Federal Circuit decisions analyze motivation to combine as part of the scope and content of the prior art, *see, e.g., Monarch Knitting Mach. Corp.*, 139 F.3d at 881–83, but the Federal Circuit suggested in 2001 that motivation to combine is a separate inquiry from the *Graham* factors. *See McGinley v. Franklin Sports*, 262 F.3d 1339, 1351 (Fed. Cir.2001). However, the latest relevant Federal Circuit decision treats motivation to combine as flowing naturally from the *Graham* factor measuring differences between the prior art and the claimed invention. *See Prince-*

ton Biochem., Inc., 411 F.3d at 1337 (even if prior art discloses every element of claimed invention, motivation to combine must be shown). Accordingly, I will examine motivation to combine as part of this factor.

93. *See, e.g., Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1359–60 (Fed.Cir.1999); *Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1572 (Fed.Cir.1996). "Even if all [the patent-in-suit's] limitations could be found in the total set of elements contained in the prior art references, a claimed invention would not be obvious without a demonstration of the existence of a motivation to combine those references at the time of the invention." *National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337 (Fed.Cir.2004). To be sure, the motivation to combine need not be expressly stated. *See Riverwood Int'l Corp. v. The Mead Corp.*, 212 F.3d 1365, 1366 (Fed.Cir.2000).

94. *See Boehringer*, 320 F.3d at 1354; *see also Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1124–25 (Fed. Cir.2000).

95. *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1196

The source of the teaching, suggestion, or motivation may be "the nature of the problem," "the teachings of the pertinent references," or "the ordinary knowledge of those skilled in the art."[96] "Each individual reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect."[97] A court must also determine whether the prior art references in question "teach away" from, or discourage, the claimed design.[98]

 "Broad conclusory statements regarding the teaching of multiple references, standing alone, are not 'evidence' [of motivation to combine]."[99] Additionally, to examine obviousness *at the time the invention was made* "requires the oft-difficult but critical step of casting the mind back to the time of invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then-accepted wisdom in the field ..." in order to "guard[ ] against entry into the tempting but forbidden zone of hindsight."[100] This means, among other things, that a court must avoid the temptation to " 'use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention,' "[101] and must also avoid "[d]efining the problem in terms of its solution." [102]

### 4. Objective Evidence of Non–Obviousness/Secondary Considerations

 The Supreme Court has noted that inquiry into one of several "secondary considerations ... may have relevancy ... as indicia of obviousness or nonobviousness."[103] These considerations include "commercial success, long felt but unsolved needs, [and] failure of others [to address the problems claimed to be addressed by the patent-in-suit]."[104] Such evidence has long been valued as "a helping hand to the judiciary which ... is most ill-fitted to discharge the technological duties cast upon it by patent legislation."[105] Secondary considerations also "serve to guard against slipping into use of hindsight."[106]

Although this factor is referred to in seemingly dismissive fashion as "secondary considerations," the Federal Circuit has

(Fed.Cir.2003) (quoting *In re Beattie*, 974 F.2d 1309, 1311 (Fed.Cir.1992)).

96. *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir.1998). *Accord Akamai Techs., Inc.*, 344 F.3d at 1196.

97. *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed.Cir.1985) (emphasis in original).

98. *See, e.g., Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1378 (Fed.Cir.2005).

99. *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir.1999), abrogated on other grounds by *In re Gartside*, 203 F.3d 1305, 1316 (Fed.Cir. 2000). *Accord Ecolochem, Inc. v. Southern Calif. Edison Co.*, 227 F.3d 1361, 1372 (Fed. Cir.2000).

100. *In re Dembiczak*, 175 F.3d at 999.

101. *Ecolochem, Inc.*, 227 F.3d at 1371 (quoting *In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir. 1988)).

102. *Monarch Knitting Mach. Corp.*, 139 F.3d at 880.

103. *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684.

104. *Id.* at 17, 86 S.Ct. 684. Objective indicia of nonobviousness can also include: copying of the invention by others; praise for the invention; disbelief of experts; and unexpected results of the invention. *See, e.g., Brown & Williamson Tobacco Corp.*, 229 F.3d at 1129.

105. *Graham*, 383 U.S. at 36, 86 S.Ct. 684 (citing *Marconi Wireless Telegraph Co. of Am. v. United States*, 320 U.S. 1, 60, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943) (Frankfurter, J.)).

106. *Id.* (internal citation omitted).

made clear that such evidence is not of secondary importance:

> [E]vidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.[107]

Accordingly, a district court must at least consider such evidence before granting summary judgment on obviousness grounds.[108] Nonetheless, a patent can still be found to be obvious on summary judgment even if secondary considerations favor the patentee.[109]

■ For secondary evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention.[110] "A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent."[111] "[I]f the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus."[112] To the extent that the patentee demonstrates the required nexus, its objective evidence of nonobviousness will be accorded more or less weight.[113]

## IV. DISCUSSION

### A. Effect of *Cordis* Verdict on Validity

■ Medinol argues that because the *Cordis* jury found claim 13 of the '120 patent not invalid, I cannot find the same claim, and "the other meander claims that have similar limitations," invalid on summary judgment.[114] Medinol is wrong for two reasons. *First*, Guidant correctly states that "as there is no such thing as a 'validity' verdict, different verdicts—one finding a claim not invalid, the other one finding the same claim invalid—are not necessarily inconsistent."[115] "[P]atents cannot be held 'valid' under all circumstances. Rather, a court merely decides in

---

**107.** *Stratoflex, Inc.*, 713 F.2d at 1538. *Accord Ruiz*, 234 F.3d at 668; *see also Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed.Cir.1997) ("[i]n some cases, [secondary considerations evidence] is the most probative [evidence] of obviousness"); *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1212 (Fed.Cir.1987) ("[t]hat evidence [of commercial success] is 'secondary' in time does not mean that it is secondary in importance.").

**108.** *See, e.g., Ruiz*, 234 F.3d at 667 (district court "erred in failing to consider, or at least to discuss, evidence of secondary considerations"); *Stratoflex, Inc.*, 713 F.2d at 1538 ("evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness").

**109.** *See Ruiz*, 234 F.3d at 668; *see also Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 (Fed.Cir.1991).

**110.** *See Stratoflex, Inc.*, 713 F.2d at 1539.

**111.** *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed.Cir.1988).

**112.** *Brown & Williamson Tobacco Corp.*, 229 F.3d at 1130 (citation omitted). "The presumed nexus cannot be rebutted with mere argument; evidence must be put forth." *Id.* (citing *Demaco Corp.*, 851 F.2d at 1393).

**113.** *See In re GPAC Inc.*, 57 F.3d at 1580.

**114.** Medinol's Memorandum of Law in Opposition to Guidant's Motion for Summary Judgment of Invalidity ("Pl. Opp.") at 23–25.

**115.** Def. Mem. at 11.

a particular case that the one attacking validity has not overcome the statutory presumption of validity."[116] *Second,* as Guidant was not a party to the *Cordis* litigation, and as it claims to have new evidence of invalidity,[117] it would be inappropriate to summarily foreclose its arguments as to the "meander" claims, including claim 13 of the '120 Patent.[118]

## B. Analysis of *Graham* Factors

### 1. Scope and Content of Prior Art

For purposes of this motion, Guidant relies on only two prior art references: the Lau '955 Patent and the Fischell '370 Patent.[119] The general content of this prior art was discussed above.[120] Medinol disputes that the Fischell '370 Patent, as opposed to the earlier Fischell application that became the Fischell '312 Patent, is prior art to the patents-in-suit.[121] However, the Fischell '370 Patent is a continuation of the application that became the '312 Patent.[122] That application was filed on February 25, 1994, but the '312 Patent was not issued until July 1, 1997, two months *after* the filing of the application that became the '370 Patent. For these reasons, the Fischell '370 Patent claims priority to the application that became the '312 Patent.[123] Moreover, my earlier Opinion in this case noted that the parties agree that the Fischell '370 Patent is prior art to the patents-in-suit.[124] Thus, the Fischell '370 Patent is prior art for purposes of this motion.[125]

**116.** *Stevenson v. Sears, Roebuck & Co.,* 713 F.2d 705, 711 (Fed.Cir.1983).

**117.** *See* Def. 56.1 ¶ 211 (asserting that Guidant's arguments in this case regarding the motivation to combine Lau and Fischell were not before the *Cordis* jury).

**118.** *See, e.g., Fromson v. Imperial Metal & Chem. Co.,* Civ. A. No. 82–1173, 1989 WL 79828, at *4 (E.D.Pa. July 11, 1989) ("as [defendant] was not a party to the prior legal actions," and "claims to have new evidence of invalidity in this action ... [prior decisions as to validity] will not have preclusive effect on the validity issue in this action").

At the same time, a prior jury verdict finding patents not invalid is entitled to some weight in future proceedings, weight which varies depending on the similarity of the asserted claims, and of the evidence of invalidity, between the two cases. *See Stevenson,* 713 F.2d at 711 n. 5. However, I need not determine the exact weight to afford the prior verdict, because Guidant's motion is denied on other grounds.

**119.** *See* Def. Mem. at 1 n. 2.

**120.** *See supra* Part II.C.1; II.C.3.

**121.** Specifically, Medinol notes that the application for what became the '370 Patent was filed on May 28, 1997, almost three years after the priority date of the patents-in-suit, July 28, 1994. *See* Pl. 56.1 ¶¶ 94–96.

**122.** *See* Fischell '370 Patent, title page (noting that '370 application was a continuation of the application that became '312 patent); *see also* Pl. 56.1 ¶ 93 (same). *See Broadcast Innovation, LLC v. Charter Commc'n, Inc.,* 420 F.3d 1364, 1367–68 (Fed.Cir.2005) (patent properly claimed priority to earlier patent application, when first page of later patent made specific reference to earlier application).

**123.** "An application for patent for an invention disclosed ... in an application previously filed in the United States ... shall have the same effect ... as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application ... and if it contains or is amended to contain a specific reference to the earlier filed application...." 35 U.S.C. § 120.

**124.** *See Medinol I,* 341 F.Supp.2d at 304–05; *see also id.* at 320 (noting that Medinol conceded that the Fischell '370 Patent was prior art to the patents-in-suit in the *Cordis* litigation, which included the '120 patent at issue in this case).

**125.** In any case, the differences between the '312 and '370 patents would not materially affect my analysis. The three significant differences between the two patents are the Title, Abstract, and the drawing that appears on the first page of each patent, all of which reflect a somewhat greater emphasis on flexi-

## 2. Level of Ordinary Skill in the Art

In *Medinol I*, I held that "one of ordinary skill in the art is assumed to be an engineer working with a physician or a 'stent design team,' who are presumed to know all of the relevant prior art."[126] The parties broadly agree that this definition should apply now.[127]

The only area of disagreement concerns Guidant's assertion that "the stent design field was becoming increasingly crowded in 1994, serving to expand the knowledge base of a person of skill in the art at this time."[128] But Guidant provides no support for this assertion, aside from listing a handful of stent design patents granted before 1994.[129] Even if true, this assertion is not of value, because it provides no method for determining whether the knowledge base of a hypothetical person was in fact expanding.[130] Thus, I will adhere to the definition of ordinary skill in the art established in my earlier Opinion and agreed to by the parties.

---

bility in the '370 Patent. The '312 Patent is entitled "Stent Having a Multiplicity of Closed Circular Structures," while the later '370 Patent is entitled "Stent Having a Multiplicity of Undulating Longitudinals." Similarly, the Abstract of the '370 Patent appears to put a greater emphasis on longitudinal flexibility, obtained by using undulating longitudinals. *Compare* Fischell '312 Patent, abstract ("[a] plurality of elongated wire structures forming longitudinals . . . are fixedly secured to the rings"); *with* Fischell '370 Patent, abstract (describing "a stent having a multiplicity of frames joined together by at least two undulating longitudinal structures which can readily change their length in the longitudinal direction so as to provide increased longitudinal flexibility for the stent."). Finally, the diagram appearing on the title page of each patent differs in one crucial respect—the longitudinals in the '370 Patent's diagram are undulating, instead of straight as in the '312 Patent.

Even so, the '312 Patent also contains many references suggesting the use of undulating longitudinals. *See* Fischell '312 Patent col. 1, ll. 48–49, 62–64 (longitudinals can be either straight or undulating); *id.* col. 2, ll. 31–33 (describing Figure 8 which discloses undulating longitudinals); *id.* col. 3, ll. 44–48 (a stent with undulating longitudinals "would bend more easily during insertion into a vessel and would be more readily adaptable for placement in curved vessels such as some coronary arteries."); *id.* col. 5, ll. 17–18 (claim 8 of patent, "wherein all the longitudinals are of an undulating shape so as to enhance longitudinal flexibility."). Moreover, the Figures are identical in both patents.

**126.** *Medinol I*, 341 F.Supp.2d at 321.

**127.** *See* Def. Mem. at 10; Pl. Opp. at 3 n. 1. The level of ordinary skill is described by one of Medinol's experts as follows:

> In my opinion, as of July 1994, persons having ordinary skill in the art of stent design would have included (i) physicians specializing in a field related to stents, such as interventional radiology and cardiology; and (ii) engineers having at least a bachelor's degree in mechanical and biomedical engineering or materials science or equivalent, and experience in designing implantable medical devices. Because stent design in 1994 was typically a collaborative effort, with engineers consulting with physicians and vice versa, the scope of knowledge and skills available to the engineer would have included the knowledge and skills of a physician, and vice versa. The person with engineering knowledge and skills would have had a basic knowledge of structural mechanics and material properties, and would have had sufficient skills to apply that knowledge to stent design.

Pl. 56.1 ¶¶ 118–119 (quoting Rebuttal Expert Report of Alan Snyder, dated March 22, 2005, at 3); *see also* Def. 56.1 ¶ 118–119 (citing Snyder report and adopting it as an accurate statement of ordinary skill in the art).

**128.** Def. 56.1 ¶ 120.

**129.** *See id.*

**130.** Indeed, Medinol responds to Guidant's assertion merely by listing another batch of stent patents issued *after* 1994. *See* Pl. 56.1 ¶ 120 (noting that "a great number of stent patents have been issued by the United States Patent Office for inventions made after 1994," and listing such patents).

### 3. Differences Between the Claimed Invention and the Prior Art

#### a. Presence of Claim Limitations in Lau and/or Fischell

Much of Guidant's opening brief is devoted to demonstrating that each limitation of the patents-in-suit is disclosed by Lau and/or Fischell.[131] However, Guidant also concedes that many of the limitations of the patents-in-suit are present in the prior art only if one combines certain disclosures of Lau and Fischell in a certain way.[132] At the same time, Medinol does not seriously dispute that one could find every claim of the patents-in-suit in Lau, Fischell, *or a certain combination* of the two references.[133] For this reason, analysis of this factor will necessarily turn on whether a motivation to combine the prior art existed.[134] Thus, I will only briefly summarize the similarities and differences between Lau, Fischell and the patents-in-suit, before turning to whether there was a motivation to combine Lau and Fischell in the manner Guidant claims.

The presence of some limitations of the patents-in-suit in the prior art cannot be reasonably disputed. For example, Lau discloses first meanders as construed by the Court, and as required by all asserted claims of the '120 and '981 Patents.[135] These first meanders include "loops,"[136] and "circumferential members,"[137] within the meaning of this Court's construction of those terms. Lau also discloses claim 13 of the '120 patent's limitation of "an expandable stent formed of an elongated cylindrical unitary tube."[138] I have already held that Lau Figure 5 discloses "a plurality of enclosed spaces" within the meaning of several of Medinol's claims.[139] Finally, Lau discloses U or C-shaped structures.[140]

I have construed the term "second meander" to mean "a periodic pattern about a center line oriented in a direction different from the axis of the first meanders."[141] A

---

131. *See* Def. Mem. at 12–24; *see also generally* Ex. 13 to Shaffer Decl. (summary claim chart).

132. *See* Def. Mem. at 14–15, 17, 18, 21–23 (relying on a combination of Lau and Fischell to find certain claim limitations in prior art); *see also id.* at 4, 15, 21–22; Def. 56.1 ¶ 82 (depicting a hypothetical combination of Lau and Fischell that discloses all claims of patents-in-suit).

133. *See* Pl. 56.1 ¶ 82 (responding to Guidant's "hypothetical" stent—"[u]ndisputed that Guidant has created a fictional stent, using hindsight, by incorporating, in a manner not taught or suggested by these references, selected elements from Figure 11 of the Lau Patent and Figure 8 of the Fischell Patent to create the figure above"); *see also* Pl. Opp. at 4–18 (focusing arguments on motivation to combine Lau and Fischell).

134. *See supra* note 92.

135. *See* 5/21/04 Warren Sherman Deposition Transcript of ("Sherman Dep. Tr.") at 159, Ex. 7 to Shaffer Decl. (Medinol's expert admitting Lau discloses first meanders); *see also* 6/14/05 Alan Snyder Deposition Transcript

("Snyder Dep. Tr.") at 173, Ex. 8 to Shaffer Decl. (same); Pl. 56.1 ¶ 66 (undisputed that Lau contains "periodic sinusoidal patterns about a center line").

136. *See* Pl. 56.1 ¶ 79 (not disputing that Lau Figure 11 discloses loops); *see also* Sherman Dep. Tr. at 169–70 (testimony that Lau discloses loops).

137. *See* Sherman Dep. Tr. at 176–77 (testimony that Figure 5 of Lau discloses a circumferential member within the Court's construction of that term).

138. '120 Patent, cl. 13; *see also* Lau '955 Patent col. 1, ll. 53–58 (disclosing this limitation); *id.* Fig. 2 (same).

139. *See Medinol I*, 341 F.Supp.2d at 324. Claim 13 of the '120 Patent and claims 6 and 7 of the '982 Patent require, inter alia, a plurality of enclosed spaces.

140. *See* Pl. 56.1 ¶ 78 (not disputing that Lau Figure 11 discloses such structures).

141. *Medinol II*, 2004 WL 2210290, at *13.

plurality of second meanders, required by all the asserted claims of the '120 and '981 Patents, is disclosed by Lau Figure 5.[142] However, Guidant strains to find second meanders in the Fischell Patent, because this Court's construction requires that a second meander be accompanied by a first meander. And despite Guidant's contention, Fischell does not disclose first meanders, because Fischell teaches the desirability of circular rings, rather than the undulating rings of Lau.[143]

Moreover, Lau Figure 11, on which Guidant heavily relies as the starting point for its asserted combination of Lau and Fischell, does not have a plurality of second meanders, as the rings of Lau Figure 11 only have one connector.[144] To obtain such a plurality of second meanders in Lau Figure 11, Guidant must add connectors to Lau's drawing.[145] Guidant similarly depends on a hypothetical combination of Lau and Fischell to find in the prior art several other claims of the patents-in-suit entailing a plurality of second meanders, because the second meanders disclosed in Lau Figure 5 do not otherwise correspond to the limitations of the patents-in-suit.[146]

The parties also dispute whether flexible cells, of the type required by the '381 Patent, appear in the prior art.[147] Again,

**142.** *See* Pl. 56.1 ¶ 71 ("[u]ndisputed that Figure 5 of Lau disclosed second meanders. However, those second meanders are not 'formed with loops' that are distinct from the loops of the first meanders").

**143.** *See, e.g.,* Sherman Dep. Tr. 181–82 (asserting that nothing in the Fischell reference includes a first meander). Guidant's assertion to the contrary relies on an extrapolation of a pattern found in Figure 9 of Fischell, which is a side view of the stent in an unrolled state. *See* Def. Mem. at 7 (citing Sherman Dep. Tr. 184–85, where Guidant's counsel drew a pattern superimposed on Fischell Figure 9 reminiscent of a first meander). Guidant also relies on an out-of-context statement made by Dr. Richter earlier in this case. *See* Declaration of Jacob Richter at 8, Ex. 11 to Shaffer Decl. ("The only design in the prior art ... [containing] a structure that could be seen as a second meander was the Fischell design ... [but] in this design the 'longitudinals with undulation were introduced because the rings were hoops and their function is different.' "). But in the expanded state, Lau, but not Fischell, possesses first meanders. *Compare, e.g.,* Lau Fig. 3 *with* Fischell Fig. 8.

**144.** A second meander necessarily runs to some extent along the links between rings of a stent.

**145.** *See, e.g.,* Def. Mem. at 13–14 ("once additional connectors or links are added to Figure 11 as taught by Lau ... [Medinol's expert] was able to find 'second meanders' on Fig. 11"); *see also* Sherman Dep. Tr. Ex. 5 (rendering of Figure 11, with additional connec-

tors drawn in green, and putative second meanders drawn in blue).

**146.** *See* Def. Mem. at 14–18. These limitations of the patents-in-suit include "first and second meanders are formed with loops and are interconnected"; and "one of the loops of each of the first meanders is disposed between each consecutive second meander," '120 Patent, cl. 13; "the first and second meanders are connected together such that the loops thereof cooperate so that upon bending of the stents the loops change shape to compensate for the difference in length between the inside and outside curves" '120 Patent, cl. 16; "said second meander patterns intersect with said first meander patterns so as to leave at least one loop of said first meander patterns between each pair of adjacent second meander patterns;" '120 Patent, cl. 27; "said second meander patterns intersect with said first meander patterns at common members which are shared by said first and said second meander patterns;" '120 Patent, cl. 28; and "wherein the second meander patterns are connected to the first meander patterns so as to leave no more than two loops of each of the first meander patterns between each pair of adjacent second meander patterns." '982 Patent, cl. 1.

**147.** It is unnecessary to reach Medinol's assertion that Guidant's argument concerning flexible cells improperly relies on an erroneous interpretation of this Court's construction of that term. *See* Pl. Opp. at 17 (citing Medinol's Memorandum of Law in Support of its Motion for Summary Judgment of Literal In-

Guidant relies on its hypothetical *combination* of Lau and Fischell to find many, if not all, of the required elements of the asserted claims of the '381 Patent in the prior art.[148] Medinol argues that Guidant cannot use its hypothetical stent to prove the obviousness of the '381 claims because it "has not provided—and cannot provide—any evidence regarding how flexible or 'longitudinally stiff' Guidant's fictional stent is."[149]

### b. Motivation to Combine

 In any event, even if every element of the patents-in-suit were present in Lau and/or Fischell, this would not end the inquiry. Guidant must still show a motivation to *combine* these elements of Lau and Fischell, with a reasonable expectation of success, to arrive at the designs disclosed by the patents-in-suit. Drawing all reasonable inferences in Medinol's favor—as I must—I conclude that Guidant cannot show the absence of genuine issues of material fact.[150]

Guidant's evidence regarding motivation to combine falls into two categories. *First,* Guidant asserts that a combination of Lau's out-of-phase serpentine rings, as pictured in Figure 11, and the undulating connectors disclosed by Figure 8 of Fischell, would produce a stent exhibiting every limitation of the claims at issue in this case.[151] *Second,* Guidant asserts that "there is evidence that persons skilled in the art of stent design in July 1994—[the Burmeister engineers]—actually did combine the concepts disclosed in Lau (sinusoidal rings) and Fischell (undulating connectors) in their efforts to design a stent."[152]

As an initial matter, Guidant asserts that "the Lau and Fischell patents are directed to the same problem—creating a flexible stent."[153] But this statement of the problem is pitched at an improper level of generality. As Medinol notes, the problem of creating a flexible stent as such was solved by the prior creation of the coil stent.[154] In fact, Lau and Fischell are

---

fringement of the '120 and '381 Patents at 19–23).

148. *See, e.g.,* Def. Mem. at 20 ("the combination of the Lau patent with additional curved connectors, as taught in Fischell, would result in a flexible stent before expansion, but a 'rigid' or longitudinally stiff stent after expansion"); *see also id.* at 22 (claims 57 and 66 of the '381 Patent, requiring that "in the unexpanded state, a radial plane perpendicular to the longitudinal axis can pass through the flexible links of the flexible cells and not pass through the circumferential member," is present in the prior art because "the combination of Lau Fig. 11 and Fischell" meets this claim).

I previously found "flexible links," as required by certain asserted claims of the '381 Patent, in the prior art. *See Medinol I,* 341 F. Supp 2d at 324.

149. Pl. Opp. at 17–18. Guidant's expert, Dr. Charles Taylor, testified that he could not "determine rigidity based [merely] on a pattern," but would have to test a stent to make such a determination. 6/8/05 Charles Taylor Deposition Transcript ("Taylor Dep. Tr.") at

123, Ex. 29 to Gonell Decl. To be sure, one of Medinol's experts testified that he believed that Figure 5 of Lau discloses flexible cells, because Figure 5 "contains cells that are substantially flexible prior to expansion and substantially rigid after expansion." Sherman Dep. Tr. at 175.

150. However, a reasonable factfinder could find Guidant's evidence of invalidity persuasive. For this reason, I decline Medinol's invitation to grant summary judgment in *its* favor. *See* Pl. Opp. at 21.

151. As already noted, Guidant has constructed a hypothetical stent to illustrate this combination. *See supra* note 132.

152. Def. Mem. at 24.

153. *Id.*

154. *See* Pl. Opp. at 6. Of course, as noted above, coil stents did not achieve desirable levels of radial support once deployed. *See supra* note 18 and accompanying text.

directed to somewhat different problems in the stent art. Specifically, while Lau attempts to achieve a balance between deliverability (i.e. flexibility) and radial support once deployed, the primary concern of Fischell is to achieve sufficient "hoop strength," for radial support.

To be sure, Fischell also teaches that longitudinal predeployment flexibility can be addressed through the use of undulating longitudinals.[155] But Guidant does not adequately explain why a stent designer of ordinary skill, seeking to address the same problems sought to be addressed by the patents-in-suit, would adapt the undulating longitudinals of Fischell Figure 8 to the straight connectors of Lau, but at the same time disregard Fischell's teachings 1) favoring the use of longitudinals running the length of the stent, as opposed to connectors between each pair of rings;[156] and 2) prescribing the use of circular hoops as opposed to Lau's meandering rings.

Nor does Guidant adequately explain why Lau Figure 11 would be selected as a starting point to combine Lau and Fischell, as opposed to the inphase design of Lau Figure 5, which Lau teaches would minimize or prevent foreshortening (a concern addressed by the patents-in-suit).[157] Similarly, while Guidant correctly notes Lau's teaching that adding connectors between rings addresses one goal of the patents-in-suit, improved "scaffolding," preventing harmful gaps between rings, Medinol has raised a serious question as to whether adding connectors for that purpose to Lau Figure 11, as Guidant proposes, is consistent with Lau's goals and teachings.[158]

---

**155.** *See, e.g.,* Fischell '370 Patent, abstract (describing "a stent ... joined together by at least two undulating longitudinal structures which can easily change their length in the longitudinal direction so as to provide increased longitudinal flexibility for the stent for easy passage through and placement within a curved vessel such as a coronary artery"); *see also supra* note 125.

**156.** Indeed, Fischell discloses no hint that longitudinals are meant to be anything other than wires that connect most, or all, rings of the stent. Moreover, although I have not construed the term "longitudinals," another court has construed Fischell's longitudinals as: "[s]tructures that extend or run lengthwise, in the direction of the stent's longitudinal axis. Although there is no requirement that the longitudinals or longitudinal structures extend the entire length of the stent, the structures have to extend long enough to be considered continuous across a number of points of support." *Medtronic,* 194 F.Supp.2d at 336–37.

**157.** *Compare* Lau '955 Patent col. 2, ll. 42–46 ("[p]referably, the undulating patterns of [Figure 5's] individual cylindrical structures are in phase with each other in order to prevent the contraction of the stent along its length when it is expanded"); *with, e.g.,* '120 Patent col. 1, ll. 57–59 ("It is therefore an object of the present invention to provide a flexible stent which minimally shrinks, in the longitudinal direction, during expansion.").

**158.** *See* Snyder Dep. Tr. at 183–84, Ex. 17 to Gonell Decl:

> Now, if you look at [Lau] figure 11, notably Lau shows only one connector between adjacent rings and that's consistent with Lau's goal of having a stent that's flexible and doesn't foreshorten, and if you ... add connectors in the manner that [Guidant's counsel] suggested ... you immediately get a stent that notably foreshortens every bit as much as the Palmaz slotted tube foreshortens and, in my judgment, you have probably ruined the flexibility of the stent as well. So in my opinion, the addition of any additional connectors to figure 11 ... would be contrary to Lau's teachings in at least two ways.

Guidant asserts that Snyder's testimony cannot be credited because it "directly contradicts prior testimony he gave at the *Cordis* trial *on the exact same issues.*" Reply Memorandum in Further Support of Guidant's Motion for Summary Judgment of Invalidity ("Def. Reply") at 3 (emphasis in original). Snyder testified on cross-examination in *Cordis* that: 1) starting with the out-of-phase rings of Figure 11 would be an "ordinary design choice;" and 2) that once one chooses to start with Lau Figure 11, it would be

Guidant attempts to bridge these gaps in its theory by noting that Lau is not explicitly limited to the use of straight, as opposed to longitudinal connectors;[159] and that the term "longitudinal" in Fischell is not explicitly limited to structures that run the length of the stent and connect all the rings.[160] However, neither of these interpretations flow naturally from the teachings of either patent, and to the extent that the parties offer equally plausible interpretations of the prior art, factual dis-putes must be resolved in Medinol's favor at the summary judgment stage.[161]

■ The Burmeister Application is offered by Guidant as real-world evidence of motivation to combine.[162] Although Medinol attacks the probative value of this reference on several grounds, two of its arguments can quickly be set aside. *First,* it is of no consequence whether the Burmeister reference is prior art, because Guidant does not offer it for that purpose. Rather

---

natural to adopt looped connectors of some type for flexibility, and to add connectors to help with scaffolding. *See id.* at 3–4 (citing *Cordis* Joint Appendix at A2070–76).

However, this testimony does not directly contradict Snyder's report in this case, because he merely agreed with assertions of opposing counsel that certain choices in the prior art could be *among* the options one might choose in 1994 when designing a stent. *See, e.g., Cordis* Joint Appendix at A2076 (Snyder agreeing with counsel that, in general, adding connectors addresses scaffolding problems in the prior art, but not stating that it would make sense to add connectors to a design based on Lau Figure 11). In any case, to the extent that Guidant offers Dr. Snyder's prior testimony for impeachment, it is well established that credibility determinations are almost never appropriate at summary judgment. *See, e.g., Jeffreys,* 426 F.3d at 553–54.

159. *See* Def. 56.1 ¶ 89 (citing Sherman Dep. Tr. at 174–75, Ex. 16 to Gonell Decl., which reads):

> Q: [ ] Is there anything that is explicit in there that limits Lau to straight connectors?
> A: Well, certainly all of the art utilizes straight connectors. Insofar as I can see from figures, no alternative connectors are described.
> (Witness perusing document)
> A: In this review you've permitted me to have now, I do not see the word "straight" mentioned with regard to the connecting elements.

160. *See id.* ¶ 156 (citing Fischell '370 Patent, col. 1, ll. 64–67) ("[t]he teachings of Fischell do not require that the longitudinals extend along the entire length of the stent"); *but see supra* note 156.

161. *See Bayer AG v. Carlsbad Tech., Inc.,* No. Civ. 01–867–B, 2001 WL 34125673, at *5 (S.D.Cal. Oct. 24, 2001) (citing *Cooper v. Ford Motor Co.,* 748 F.2d 677, 679–80 (Fed.Cir. 1984)) (what the prior art teaches is a question of fact, and patentee "has defeated the summary judgment motion [of invalidity] by contradicting [defendant's] interpretation with different, reasonable interpretations of the [prior art] teachings").

At the same time, I decline to consider Medinol's evidence concerning testimony of, and design choices made by, Guidant engineers in the years after 1994. *See* Pl. Opp. at 13–14 (asserting that as Guidant engineers in the mid to late 1990's allegedly did not draw on Lau and Fischell when designing stents, there was no motivation to combine those references, and asserting that Guidant's failure to disclose motivation to combine Lau and Fischell to the PTO "confirms that [Guidant does] not actually believe that a person of ordinary skill in the art would be motivated to combine Lau and Fischell."). Guidant correctly notes that such evidence amounts to improper hindsight analysis of doubtful relevance. *See* Def. Reply at 4–6.

162. *See* Def. Mem. at 24 (asserting that the Burmeister Application shows that "finding evidence of motivation to combine is not a hypothetical exercise in this case"). "Evidence that a person of ordinary skill in the art recognized the same problem to be solved as the inventor and suggested a solution is, at the least, probative of a person of ordinary skill in the art's willingness to search the prior art in the same field for a suggestion on how to solve that problem." *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1322 (Fed.Cir.2005).

it is offered as evidence of a person of ordinary skill's contemporaneous motivation to combine prior art.[163]

*Second,* at the time of the invention, the Burmeister inventors did not possess extraordinary skill in the art. Although it is true that both Brown and Euteneuer, who drew Figures 14a and 14b, ultimately became accomplished inventors in the field of interventional cardiology, neither had significant experience in the field in 1994.[164] Accordingly, the Burmeister Application is relevant to whether a person of ordinary skill would be motivated to combine Lau and Fischell.[165]

Even so, the Burmeister Application cannot be dispositive here because it does not establish that the claimed combination of prior art carried a reasonable expectation of success. Indeed, Medinol asserts that the design based on Figures 14a and 14b was a failure, as "the design was inflexible, had protrusions into the lumen on expansion, and could leave significant gaps on the outside of a bend."[166] It may be

**163.** *See National Steel Car, Ltd.,* 357 F.3d at 1338 (contemporaneous drawing similar to patent-in-suit relevant to motivation to combine, regardless of whether it is prior art: "we are concerned only with whether the Lund drawing demonstrates that others in Mr. Lund's position ... would have considered it obvious to combine the elements found in [the prior art references]"); *see also id.* at 1339 (discussing a different disclosure: "Whether or not the Prichard disclosure is a prior art reference, it is evidence that can be used to demonstrate a motivation to combine implicit in the knowledge of one of skill in the art....").

**164.** *See supra* note 32.

**165.** However, Medinol's argument is not without merit. As the record is clear that Brown and Euteneuer had little relevant experience in stent design in 1994, I take Medinol to mean that the Court should deem them to be inventors possessing *extraordinary* skill in the art in 1994, based on their intrinsic genius in the relevant field, which only *later* revealed itself to the world through the dozens of patents that they obtained. *See* Pl. Opp. at 16 ("the inventive productivity of Mr. Euteneuer and Mr. Brown, as well as their employment history, demonstrates that they are not ... persons of 'ordinary skill in the art' "). The Federal Circuit recognizes that inventors possess special talent reaching beyond mere experience. *See Standard Oil Co.,* 774 F.2d at 454 (emphasis in original) ("Inventors, as a class ... possess something—call it what you will—which sets them apart from the workers of *ordinary* skill."); *see also Stratoflex, Inc.,* 713 F.2d at 1538 (courts should not determine obviousness from standpoint of "rare genius" in the art). For example, it would be strange for a court to deem Thomas Edison a "person of ordinary skill" as of the day he obtained his first patent, if that court were aware that Edison eventually became one of history's great inventors.

However, I am constrained to find Brown and Euteneuer to be of ordinary skill for the purpose of evaluating the Burmeister Application, for three reasons. *First,* a contrary finding would be in tension with the Federal Circuit, which has already referred to the Burmeister engineers as "people of ordinary skill." *Cordis II,* 87 Fed.Appx. at 735–36. *Second,* the definition of "extraordinary skill in the art" does appear to encompass a measure of relevant experience. *See, e.g., Eli Lilly & Co. v. Teva Pharm.,* No. IP 02–0512–C–B/S., 2004 WL 1724632, at *40 (S.D.Ind. July 29, 2004) (team of research clinicians possessed extraordinary skill in the art because, inter alia, the team was much more familiar with the relevant technology than one of ordinary skill would have been); *cf.* Pl. Opp. at 16 (relying in part on the positions held by Brown and Euteneuer after 1994). *Third,* Medinol has cited no case, and I have found none, where a court engaged in hindsight to determine skill level.

**166.** Pl. 56.1 ¶ 112 (citing Brown Dep. Tr. 112–14). Brown testified that, when prototypes of the design shown in Figures 14a and 14b of the Burmeister application were produced, he found them to be "insufficiently flexible," and also that there was protrusion of stent elements inside the cylinder of the stent, which if implanted would cause a blood flow disturbance. *See* Brown Dep. Tr. 112–14. At least in part because of these problems, Brown and his team discontinued work on designs based on Figures 14a and 14b. *See id.* at 115–16.

true, as Guidant contends, that the design was not a failure as such because it was merely experimental, never intended for development into a marketable product.[167] However, the fact that the design was apparently unsuccessful undercuts its probative value,[168] at least at this stage of the proceedings.[169]

### 4. Secondary Evidence

█ Medinol has submitted several types of objective evidence of non-obviousness. *First,* it asserts that the NIR stent met with commercial success, with 2.2 million units sold between 1996–2000.[170] The term "NIR" stent as used by Medinol apparently means both the "original" NIR stent, and a later product called the "NIR Conformer" which incorporated modifications to the end rings of the stent in order to "achieve better conformability, higher radial strength at the end, [and] better trackability."[171]

*Second,* Medinol asserts that there was a long-felt need in the industry for stents exhibiting the characteristics taught by the patents-in-suit.[172] *Third,* Medinol asserts that many in the industry, including Guidant, failed to overcome known problems in the prior art stents.[173] *Fourth,* Medinol notes praise of the stent designs based on the Medinol patents by others in the industry, including Johnson & Johnson, which attempted to buy Medinol's NIR design, despite already owning the rights to the Fischell '370 Patent.[174]

167. *See* Def. 56.1 ¶¶ 167–168 (asserting that "[the models based on] figures 14a and b were manufactured as prototypes"); *see also id.* ¶ 169 (quoting trial testimony from prior litigation, not included in Guidant's submission) (asserting that the reason why the Burmeister application was abandoned was that "the fig. 14 design was so ordinary, it was not worth patenting").

168. *See Boehringer,* 320 F.3d at 1354 (party attacking validity must show motivation to combine with a reasonable expectation of success, and actual reports of failure are strong evidence negating reasonable expectation of success).

169. For this reason, the Federal Circuit's crediting of the Burmeister reference in *Cordis* as evidence of motivation to combine is not controlling. The Federal Circuit merely reviewed a jury verdict for the existence of "substantial evidence" to support that verdict. *See Cordis II,* 87 Fed.Appx. at 733.

170. *See* Pl. Opp. at 22 (citing Richter Dep. Tr. at Ex. 4). Medinol also quotes the President of Guidant's Vascular Intervention division, Dana Mead, as testifying in another proceeding that "[p]rior to the NIR stent being launched, you could argue that it was a three-horse race or a two-horse race, but it was really AVE and Guidant until Boston [Scientific, or BSC] came out with the NIR stent. But I think that since the NIR stent has been launched, [Guidant and BSC] have controlled on average between 65 and 85% of the market

in the U.S." 8/4/04 Deposition Transcript of Dana G. Mead, *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* No. IP 98–1108 (S.D.Ind.), Ex. 24 to Gonell Decl. at GC178093. Mead also testified that "people were using the NIR not because of the platform, they were using it because they believed it was a good stent that delivered good clinical data. I don't think it was the platform that was driving that." *Id.* at GC178086.

171. Richter Dep. Tr. at 165.

172. *See* Pl. 56.1 ¶¶ 178–179 (citing Arbitration Brief at GC154621–624) (asserting that the patents-in-suit addressed the "well-known" deficiencies of the rigid Palmaz stents and weak coiled wire stents).

173. *See* Pl. Opp. at 22. For example, Medinol asserts, and Guidant disputes, that several Guidant stent designs subsequent to the Multi–Link based on the Lau Patent tried and failed to attain the balance of flexibility and radial support achieved by Medinol's products. *See* Pl. 56.1 ¶¶ 180–196.

174. *See* Pl. 56.1 ¶¶ 197–203. "Recognition and acceptance of the patent by competitors who take licenses under it to avail themselves of the merits of the invention is evidence of nonobviousness." *Stratoflex, Inc.,* 713 F.2d at 1539. *Accord Sandisk Corp. v. Lexar Media, Inc.,* 91 F.Supp.2d 1327, 1336 (N.D.Cal.2000) ("[t]hat competitors are willing to pay mil-

Guidant first disputes that Medinol has shown the required nexus between the patents-in-suit and the NIR stents.[175] Guidant asserts that Medinol has failed to put forward prima facie evidence to support a nexus, and also notes that one of Medinol's own experts, Dr. Snyder, testified that he has never analyzed the claims of Medinol's patents in connection with the NIR stent under this Court's claim construction.[176]

But Guidant *itself* states that "[t]he original NIR stent is *the* commercial embodiment of Medinol's patents."[177] Medinol, for its own strategic purposes, disputes this apparent admission, asserting in response that "[t]he NIR stent is *a* commercial embodiment of some claims of some Medinol patents" no longer at issue in this case.[178] Aside from Guidant's admission, there are few clear indications from the record that the original NIR stent does in fact practice the teachings of the patents-in-suit.[179]

Regarding the NIR Conformer, Medinol asserts that "the NIR Conformer stent as a whole is an embodiment of the Patents-in–Suit," relying on testimony of Richter to that effect.[180] However, Guidant points to the same testimony to make the contrary assertion.[181] Although Medinol's interpretation of Richter's testimony seems more plausible,[182] the record as a whole is unclear as to whether the NIR Conformer in fact practices the teachings of the patents-in-suit, creating a disputed issue of material fact that, on this point, cuts against Medinol as it has the initial burden to show a nexus.[183] Accordingly, as the nexus between either of the NIR stents and the patents-in-suit established by this

lions of dollars to license [a patent] is evidence that [the patent] was not obvious").

Medinol also asserts that copying of the invention by others, including by the products accused of infringement in this case, supports a finding of non-obviousness. *See* Pl. Opp. at 23. I decline to consider this evidence as it pertains to the accused products, given that infringement has not yet been determined. Additionally, as noted by Guidant, Medinol's proffered evidence on this score amounts to "argument, not fact." Def. 56.1 ¶ 204.

175. *See* Def. Reply at 8; *see also, e.g., In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed.Cir.1991) ("information solely on number of units sold insufficient to establish commercial success"); *Liberty Leather Prods. Co. v. VT Int'l, Ltd.*, 894 F.Supp. 136, 141 (S.D.N.Y.1995) (unsupported affidavit of inventor of patent-in-suit insufficient to establish nexus).

176. *See* Snyder Dep. Tr. at 243 (Q: "[d]o you have an opinion as to whether the NIR stent practices any of the asserted claims in this case? A: I've never done any analysis of— I've never done any analysis of the NIR stent under the claim construction issued by the court in this case.").

177. Def. 56.1 ¶ 19 (emphasis added).

178. Pl. 56.1 ¶ 19 (emphasis in original). Specifically, Medinol asserts that the original NIR stent is an embodiment of some claims of the '303 patent. *See id.* (citing Snyder Dep. Tr. at 94, Ex. 18 to Gonell Decl.).

179. Richter testified under oath at the *Markman* hearing that "the NIR stent [ ] was developed along the teaching of the Israel patent by Medinol." *Markman* Tr. at 15.

180. Pl. 56.1 ¶¶ 20, 136.

181. *See* Def. 56.1 ¶¶ 20, 136 (quoting Richter Dep. Tr. at 169) (asserting that Dr. Richter testified that the "new geometry of the NIR Conformer design" is not embodied nor included in Medinol's patents).

182. From context, it appears that Richter's reference to the "new geometry" not embodied by the patents-in-suit is a narrow reference to a change in the end ring design of the stent, not implicating the teachings of the patents-in-suit. *See* Richter Dep. Tr. at 167–69.

183. *See, e.g., Demaco Corp.*, 851 F.2d at 1392 (initial burden is on patentee to establish prima facie case for nexus).

record is uncertain, the weight afforded Medinol's secondary evidence concerning the original NIR stent is significantly reduced.[184]

Aside from the nexus issue, the remainder of Guidant's response to Medinol's secondary evidence underscores that there are disputed issues of material fact regarding this factor. For example, Guidant responds to Medinol's evidence of long-felt need for the invention by providing its own contrary evidence, asserting that a pre-commercial version of Guidant's Multi-Link stent (the "Bronco") negated any long-felt need that might have been addressed by Medinol's patents.[185]

Guidant also disputes whether Medinol's NIR stents were in fact commercially successful, based on the fact that sales fell sharply three years after introduction.[186] Similarly, Guidant's evidence of problems identified with the NIR stent, offered in response to Medinol's evidence concerning praise for the invention in the industry, merely creates a disputed issue of fact concerning whether the patents-in-suit in fact met with general praise in the industry.[187] For these reasons, consideration of this *Graham* factor militates slightly against granting summary judgment.

## V. CONCLUSION

There are no disputed issues of material fact concerning two of the *Graham* factors: scope and content of the prior art and level of ordinary skill in the art. However, as set forth above, disputed issues of material fact exist regarding the last two *Graham* factors: differences between the prior art and the claimed invention, and secondary considerations.

In particular, on the decisive issue of whether one of ordinary skill in the art in 1994 would have been motivated to combine the Lau and Fischell references to create the claimed invention, both parties offer reasonable interpretations of the teachings of the prior art. Therefore, because I must draw reasonable inferences from the evidence in Medinol's favor at this stage, Guidant's motion for summary judgment of invalidity is denied.[188] The Clerk of the Court is directed to close the pending motion [number 66 on the docket sheet].

SO ORDERED:

---

**184.** *See In re GPAC Inc.*, 57 F.3d at 1580 ("To the extent that the patentee demonstrates the required nexus, his objective evidence of non-obviousness will be accorded more or less weight.").

**185.** *See* Def. Reply at 7 (citing Eric Topol, ed., *Textbook of Interventional Cardiology* 803–07, Ex. 25 to Shaffer Decl.).

**186.** *See* Def. 56.1 ¶ 172 (citing Joint Appendix to the Brief of Defendants–Appellees in *Scimed v. Johnson & Johnson*, (D.Del), Ex. 16 to Shaffer Decl., at A2226.4–A2227.6). Proceeding from its possibly mistaken premise that the NIR Conformer is not an embodiment of the patents-in-suit, Guidant also notes that "the NIR Conformer stent … was responsible for all NIR coronary stent sales from 2000 on." *Id.*

**187.** *See* Def. 56.1 ¶¶ 197–203 (citations omitted).

**188.** As Guidant raised invalidity as a counterclaim for a declaratory judgment, *see* Answer ¶¶ 56, 61–62, this issue must eventually be resolved, regardless of the resolution of the pending cross-motions for summary judgment relating to infringement. *See Pandrol USA v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1364–65 (Fed.Cir.2003) (citing *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 102–03, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993)) (finding of noninfringement does not render invalidity counterclaim for declaratory judgment moot, as invalidity and infringement are separate issues, and considering that "of the two questions, validity has the greater public importance").